UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

BILLY JOE. T.,                    )
                                 )
        Plaintiff,               )
                                 )
    vs.                          )        Case No. 1:18 CV 215 (JMB)
                                 )
ANDREW M. SAUL,[1]               )
Commissioner of the Social Security )
Administration,                  )
                                 )
        Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration. The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On September 30, 2015, plaintiff Billy Joe T. protectively filed applications for a period

of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and

supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date

of January 1, 2007. (Tr. 171-72, 173-79, 15). After plaintiff's applications were denied on

initial consideration (Tr. 77-82, 83-88), he requested a hearing from an Administrative Law

Judge (ALJ).[2] (Tr. 98-99).

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] Plaintiff previously filed applications under Titles II and XVI, alleging disability beginning on November 27, 2013. An ALJ denied those applications in a decision issued on July 11, 2014. (Tr. 63-72).

Plaintiff and counsel appeared for a hearing on June 14, 2017. (Tr. 33-59). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from plaintiff's case worker, Rebecca Murrah, and vocational expert Janice S. Hastert, M.S. The ALJ issued a decision denying plaintiff's applications on October 19, 2017. (Tr. 15-27). The Appeals Council denied plaintiff's request for review on June 30, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Reports and Hearing Testimony[3]

Plaintiff, who was born in April 1982, was 24 years old on the alleged onset date. He lived with his mother and brother and his mother's two grandchildren in his mother's home. (Tr. 38, 45-46). He had two children, ages 11 and 7, who lived with their mother. (Tr. 38). He received special education services until he left school during the 9th grade. (Tr. 37). He did not have a general education diploma. He testified that he had previously worked for a construction company, for fast food restaurants, and at Wal-Mart.[4] His mother helped him complete job applications. With the exception of the construction job, he only stayed with an employer for a month or two because he was unable to remember what he was supposed to do. (Tr. 43-44, 49). At the time of the hearing, he mowed lawns once or twice a month in exchange for an offset on his family's rent. (Tr. 39).

---

[3] Although a Function Report was mailed to plaintiff, he did not return it. (Tr. 79-80).

[4] According to a report he completed with his application, plaintiff also worked as a farm hand and sanitation aide for a waste removal company. (Tr. 221). Plaintiff's work history shows that he typically held a number of low-paying jobs in the course of a year. (Tr. 164-70).

When plaintiff applied for disability benefits in 2015, he listed his impairments as schizoaffective disorder, borderline intellectual functioning, Stevens-Johnson syndrome,[5] neuropathy, hypertension, indigestion, and headaches. (Tr. 77). In March 2017, his medications included Prazosin to treat schizophrenia; Trazodone for anxiety and sleep; Zoloft, Cymbalta, and Abilify for depression; benztropine to control medication side effects; gabapentin for neuropathy; and medications for acid reflux and blood pressure. (Tr. 269).

The Field Office interviewer noted that plaintiff had difficulty with understanding and answering questions until they were simplified. He also had difficulty remembering dates and job duties. (Tr. 210). The Disability Report he completed with the help of the interviewer lists four jobs: a job in fast food from January 2010 through March 2011 for 30 hours a week; an unspecified restaurant in 2009 for 40 hours a week; work on a farm for two months in 2015; and work for a waste removal company from 2102 to 2014. (Tr. 214). This information is not consistent with earnings reports, which show that in any given year plaintiff typically worked for a number of different employers, with earnings ranging from $165 to nearly $10,000. (Tr. 164-170, 183). Plaintiff's highest earnings occurred in 2010, when he earned $16,500 from a total of five employers. (Tr. 165).

Plaintiff testified that he was unable to work due to pain and tingling in his legs, his moods, his memory, and poor reading skills. His household chores included washing the dishes, which he did while sitting down, and mowing a lawn he described as "not real big." Both tasks

---

[5] Stevens-Johnson syndrome is a severe skin reaction most often triggered by particular medications. It often begins with a fever and flu-like symptoms and progresses to skin erosions, typically starting on the face and chest. In most affected individuals, the condition also damages the mucous membranes, including the lining of the mouth and the airways, which can cause trouble with swallowing and breathing. See https://ghr.nlm.nih.gov/condition/stevens-johnson-syndrome-toxic-epidermal-necrolysis (last visited on May 24, 2019).

took him at least an hour to complete. His mother helped him do his laundry. (Tr. 46-47). He was able to prepare simple meals such as ramen noodles and Vienna sausages. He did not socialize with others, preferring to stay home. He did not attend his children's school functions because there were "too many people." (Tr. 50). He did not attend religious services or go shopping because he was afraid "somebody will say something." (Tr. 51). Although he had a driver's license, he limited his driving because it caused pain in his legs. (Tr. 48). He had a smart phone that he used to watch YouTube videos through an app. He did not use the internet or social media. (Tr. 49). He denied having a history of drug or alcohol use.[6] He received treatment for his psychiatric conditions from professionals at Bootheel Counseling Services.

Case worker Rebecca Murrah, of Bootheel Counseling Services, testified that she had been providing mental health monitoring to plaintiff for about 6 months. Depending on her schedule, she saw him once a week or every other week. She made sure he took his medications, helped him with his medical appointments, made sure he took care of his personal hygiene, and assisted him with completing paperwork. Ms. Murrah testified that plaintiff needed regular reminders to take his medications, about which he had "constant" questions. She opined that he would need assistance to complete a job application and would not be able to work without assistance. (Tr. 52-54).

Vocational expert Janice Hastert was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who had no exertional limitations, but was limited to simple, routine, repetitive tasks with occasional interaction with co-workers and no interaction with the general public, and who could accept

---

[6] In the prior decision issued in July 2014, the ALJ determined that plaintiff had history of cannabis and methamphetamine abuse. (Tr. 65). Notes in the present record indicate that plaintiff stopped using drugs in 2003 and stopped drinking alcohol in 2013. (Tr. 547).

supervision and adapt to changes in the work place "on a basic level." (Tr. 56). According to Ms. Hastert, such an individual would be able to perform plaintiff's past work as a garbage collector, dishwasher, and sandwich maker. Other work available in the national economy the individual could perform included tumbler operator, shuttle spotter, and casting machine tender. All work would be precluded if the individual was unable remember and perform simple, routine, repetitive tasks and was unable to interact with co-workers, the public, or supervisors. (Tr. 57). In response to questions from plaintiff's counsel, Ms. Hastert testified that employment would also be precluded if the individual required repeated training every two or three weeks.

**B.    Educational Records**

Plaintiff was identified as having speech and language delays in kindergarten. (Tr. 723-24). An individualized education plan (IEP) completed when plaintiff was in second grade identified him as "educable mentally handicapped" and in need of special education services for 50 percent of his school hours with additional speech and language services. (Tr. 703). In third grade, he was described as likeable and willing to work hard if given an incentive. He had a wonderful sense of humor and got along well with everyone. He had difficulty staying awake and staying on task. (Tr. 706). Plaintiff's scores on a test of cognitive functioning administered in the fourth grade yielded a verbal IQ of 74, a performance IQ of 67, and a full scale IQ of 69, placing him in the "mentally deficient" range. In the classroom, he had great difficulty with letter and number recognition and short-term and long-term memory. (Tr. 729). In fifth grade, he was described as likeable with a pleasant personality. (Tr. 716). His scores on the Peabody Individual Achievement Test showed weaknesses in math computation and reasoning, spelling, reading comprehension, and sight vocabulary. He showed strength in general information and, because he had an interest in science, was able to remember "some" science facts when he heard

them.  In seventh grade, the percentage of time plaintiff received special education services increased.  (Tr. 718).  He was again described as very likable, but it was noted that he was lazy and it was hard to get work out of him.  (Tr. 70).  He had strengths in spelling and reading recognition; he had difficulties with applying math skills, reading comprehension, basic science, and social studies facts.  (Tr. 720).  His scores on the Weschler Intelligence Scale for Children — III yielded a verbal IQ of 76, performance IQ of 70, and a full scale IQ of 71.  (Tr. 733).  His good sense of humor was noted again in eighth grade, but he was very hard to motivate and preferred to socialize or sleep than to work.  (Tr. 740).  He had roughly equal hours of regular and special education classes.  (Tr. 739).  By ninth grade, his special education hours were sharply reduced.  (Tr. 744).   It was noted that he was working as a roofer on a part-time basis and planned to continue in that work when he graduated.  (Tr. 755).  According to counsel's prehearing memorandum, plaintiff worked for one construction company for 9 years, starting at age 16.  He was given simple tasks such as removing nails from wood frames, carrying lumber, and assisting other workers.  (Tr. 282-83).

### C.  <u>Medical Evidence</u>

#### 1.  <u>Treatment for Physical Complaints</u>

During the period under consideration, plaintiff received his primary medical care through SEMO Health Network, where he was treated by family nurse practitioners Tina Moore and Danielle E. Jansen.

In October 2012, Ms. Moore gave plaintiff a prescription for Cipro to treat bronchitis, sinusitis, and an ear infection.  (Tr. 682).  He had a bad reaction to the Cipro and went to the emergency room.  It was noted that he had a history of Stevens Johnson Syndrome in response to penicillin.  (Tr. 681-82).  In December 2012, Ms. Moore diagnosed plaintiff with thoracic and

sciatic neuritis. (Tr. 680-81). In June 2013, plaintiff presented with anxiety, high irritability, emotional liability, depression, and sleep disturbance. (Tr. 678-80). His affect was angry and anxious. His diagnoses included dysthymic disorder and panic disorder without agoraphobia, in addition to obesity. Plaintiff was prescribed the antidepressant Cymbalta. A week later, Ms. Moore noted that plaintiff had a depressed mood with sad affect and added a diagnosis of dysthymic disorder. (Tr. 380-81). She discontinued the Cymbalta and started the antidepressant Pristiq. Throughout the remainder of 2013, Ms. Moore treated plaintiff for elevated blood pressure, pain in his low back, knees and feet, swelling in his legs, sleep disturbance, dysthymia, and panic disorder. (Tr. 377-80, 376-77, 374-76, 371-74, 369-71, 368-69, 366-68, 363-65).

In 2014, plaintiff was prescribed the antidepressants Pristiq, followed by paroxetine, Celexa, and finally Brintellix. (Tr. 360-62, 664, 352-53). He quit smoking cigarettes and began using e-cigarettes. (Tr. 362, 354-56). With respect to physical complaints, plaintiff continued to present with elevated blood pressure, swelling in his legs after exercise, leg pain at night, spasm of the back muscles, and thoracic and sciatic neuritis.[7] (Tr. 664, 358-59, 357, 352-53, 349-51). He had his gall bladder removed in May 2014. (Tr. 664-66).

An MRI of plaintiff's lumbar spine completed in March 2015 disclosed mild multilevel arthropathy and mild degenerative disc disease at L5-S1, without stenosis. (Tr. 415). In June 2015, Ms. Jansen noted that plaintiff had begun receiving mental health treatment at Bootheel. He had excessive thirst and nonpitting edema. (Tr. 382-84). She discontinued Brintellix and gabapentin and directed him to lower his sodium intake, increase his water intake, increase activity, and elevate his legs when possible.

---

[7] Two pages are missing from the SEMO medical records and thus information regarding plaintiff's care in 2014 is incomplete. (Tr. 357-58 showing that pages 14-15 of 39 are missing).

In February 2016, an ankle brachial index test was completed in response to plaintiff's complaints of swelling in his legs, numbness in the right leg, and a sensation of heat at the top of his legs. (Tr. 413). No interpretation of the results was provided. Later in the month, plaintiff underwent a sleep study.[8] (430-47). The study found that plaintiff experienced a few respiratory events and snoring, but he did not qualify for positive pressure therapy. He was advised to achieve a normal body mass index. Imaging studies of plaintiff's left knee in May 2016 disclosed moderate partial thickness of the chondrosis and a small Baker's cyst without evidence of rupture. (Tr. 461, 463, 465). In September 2016, plaintiff sought emergency treatment for low back pain, which he rated at level 7, and an abrasion on his shoulder. (Tr. 449-55, 482-90).

### 2. Treatment of Mental Health Complaints

Beginning in March 2015, plaintiff began receiving psychiatric services from Bootheel Counseling Services, where Linda Kohler, M.D., provided medication management and psychiatric treatment. In August 2015, Bootheel began providing community support services to plaintiff as well.[9]

On March 25, 2015, plaintiff had a crisis counseling session at Bootheel. (Tr. 546-49). He had been hospitalized at Southeast Hospital in Cape Girardeau seven days earlier on reports that he was hearing voices, and experiencing memory loss, depression, and anxiety.[10] On April 21, 2015, Dr. Kohler completed an evaluation. (Tr. 399-400). Plaintiff described episodes in

---

[8] In his responses to a questionnaire, plaintiff rated his sleep problem as extremely severe, with a very poor average quality. He endorsed problems related to snoring, heartburn, difficulty breathing, feelings of being unable to move, nightmares, fear of going to sleep, and sensations in his leg, relieved by movement. He frequently had morning headaches and memory or concentration problems. His poor sleep caused him to be angry. He also endorsed feeling misunderstood, confused, lonely, depressed, and anxious, along with having horrible thoughts and being morally wrong, while also being brave and a good friend.

[9] More than 70 contacts between plaintiff and Bootheel professionals are documented between March 2015 and April 2017, in addition to meetings at which plaintiff was not present.

[10] Records of this hospitalization are not included in the administrative transcript.

which he heard his mother calling him or thought that someone was there. These experiences kept him awake at night and he slept during the day. He described himself as aggravated and irritable. He had two prior hospitalizations for self-harm. He dropped out of school in ninth grade because other students made fun of him. He reported that he had worked on chicken farms, built grain bins, and in fast food. Others told him that he just "can't comprehend" and "can't get it." He stated that he did not know how to read. On mental status examination, Dr. Kohler noted that plaintiff was cooperative, had "much" yawning, was a little fidgety, was goal-directed in his thinking but had paucity of thought. He denied experiencing hallucinations and suicidal and homicidal ideation, and was not delusional. He was alert, but oriented only to name, and not date, day or season. His insight was "nil" and his judgment was poor. Dr. Kohler diagnosed plaintiff with schizoaffective disorder and borderline intellectual functioning. She assigned a Global Assessment of Functioning (GAF) score of 45. She discontinued his prescription for Brintellix due to its cost, and started fluoxetine and haloperidol. For the purposes of treatment planning, Dr. Kohler identified plaintiff's strength as "seeking treatment" and his weaknesses as "mood instability" and "symptoms that interfere with daily living." (Tr. 492).

On May 6, 2015, Dr. Kohler noted that plaintiff had stopped taking the fluoxetine because it caused somnolence and that the haloperidol had not addressed his auditory hallucinations. He was taking gabapentin for leg pain. (Tr. 397). On mental status evaluation, plaintiff had appropriate grooming, unremarkable psychomotor activity, made good eye contact, had normal word fluency and goal-directed thoughts. His judgment and insight were poor, but he was alert and oriented. Dr. Kohler discontinued fluoxetine, started Sertraline, and increased the haloperidol. His GAF remained at 45. On May 14, 2015, plaintiff reported that the sertraline

helped him to "mellow" but he could not afford to fill the haloperidol prescription. (Tr. 395). His mood was improved. His mental status was unremarkable with the exception of occasional auditory hallucinations and questionable judgment and insight. His GAF was 50. On June 25, 2015, plaintiff's GAF had risen to 55. (Tr. 393). Dr. Kohler referred plaintiff to his primary care provider for treatment of his complaints of swelling in the legs.

Clinical therapist Tamara Cox, M.A., of Bootheel established treatment with plaintiff on June 25, 2015. (Tr. 511-14). Plaintiff reported that he had auditory and visual hallucinations, "anger issues," chronic insomnia, "day sleeping," obsessive thoughts, and paranoid feelings that he was in danger and others were "out to get" him. On mental status evaluation, plaintiff presented with a casual appearance, appropriate motor activity, fair eye contact, anxious mood and affect, paranoid thought content and tangential thought process, restless behavior, and appropriate speech. He was fully oriented and his memory was intact. He had fair judgment and poor insight. (Tr. 510). Ms. Cox recommended that plaintiff receive services from Bootheel's Community Psychiatric Rehabilitation Program (CPRP) to teach daily living skills, including bathing, personal hygiene, and how to maintain a household. Ms. Cox noted that she would consider a referral to an anger management group once she and plaintiff had established rapport. (Tr. 511). She set a treatment goal of reducing plaintiff's angry episodes from 7 per week to 3 per week. (Tr. 493). In both July and August 2015, Ms. Cox noted that plaintiff presented with an unkempt appearance, anxious and irritable mood with shifting affect, and off-topic thought process. (Tr. 545, 544). In August, he again reported that he could not afford his medications. He presented with pressured speech and reported experiencing paranoid thoughts and issues with anger. He was not hallucinating. He was looking forward to starting with a worker from CPRP.

Staff from Bootheel's CPRP completed a psychosocial/clinical assessment on August 28, 2015. (Tr. 496-509). It was noted that plaintiff's functioning was diminished by depression, anxiety, anger, and auditory and visual hallucinations. He reported that he managed his activities of daily living fairly well and knew how to shop for groceries and prepare simple meals. He lived with his mother and one brother in a three-bedroom house, while his children lived with their maternal grandparents. A lot of people visited his mother, which plaintiff found very stressful. On mental status examination, plaintiff had good grooming and hygiene, normal mood and affect, and was polite, cooperative, and talkative. He was oriented and his memory was intact. He was unable to spell "world" forwards or backwards. Plaintiff was assessed as having severe, enduring problems with his primary support group, educational problems, housing problems, and economic problems. His goals for involvement with CPRP were to have his own home and get approved for disability. (Tr. 558).

In September 2015, plaintiff reported that he heard voices telling him to torture people and had occasional thoughts about what it would be like to kill people who had hurt him in the past, especially when he was unable to sleep.[11] (Tr. 543, 596, 391, 530, 523). Dr. Kohler increased his Sertraline dosage and restarted Haldol. It was noted that he had good attendance at therapy and the medication clinic. (Tr. 596). Plaintiff began working with CPRP worker Sara Chapman in September 2015. (Tr. 539-40). She described plaintiff as cooperative but unkempt and anxious. His thoughts were "off topic." Plaintiff told her that he was unable to read or write beyond his own name, which embarrassed him, and that he could not work due to his inability to understand work requirements. As a result of his poor finances, plaintiff took only his blood

---

[11] Plaintiff reported that he was unable to sleep at night due to pain in his legs. (Tr. 543). Treatment notes from Bootheel reflect that plaintiff frequently complained of swelling and pain in his legs. (Tr. 393, 510-14, 382-84, 543, 539-40, 654, 565-66, 569, 573-74, 648, 642, 626-27). The pain also kept him from working. His legs were described as red and noticeably enlarged. (Tr. 539-40).

pressure and psychiatric medications. At a staffing in late September 2015, it was noted that plaintiff was very demanding, making up to 21 calls to Bootheel in a single day. (Tr. 523). He declined to attend an anger management group because he worried that he would "go off." In early October 2015, he continued to complain of frustration, paranoia, nightmares, and hallucinations, with alterations noted in his thought processes. (Tr. 521, 575-76, 654). In mid-October, he and his mother and brother had to move after a house fire. He presented with irritable and anxious mood with shifting affect. He was prescribed Prazosin, sertraline, haloperidol, and benztropine. (Tr. 579-80, 589-90, 653).

Plaintiff and his mother lived with another brother until March 2016, a situation that increased his anxiety. (Tr. 516-17, 519, 608-09, 610-11, 616-17, 618-19). Although his nightmares improved with Sertraline and prazosin (Tr. 651), he continued to present with paranoid and obsessive thought content, off-topic thought processes, anxious and/or irritable mood, and restless behavior. His judgment and insight fluctuated between fair and poor. (Tr. 581-82, 516-17, 519, 610-11, 614-15, 616-17). On March 3, 2016, he reported that he had gone to a hospital with suicidal ideation. (Tr. 630-31). He was fidgety and poorly groomed, with poor attention and concentration. His medications during this period included the antipsychotic aripiprazole, the antidepressants Cymbalta, fluoxetine and Wellbutrin, and the sedatives Trazodone and Zolpidem. On March 24, 2016, he told Dr. Kohler that his medications were helping — his sleep was "perfect," and his energy had improved. (Tr. 632-33).

In April 2016, plaintiff reported that he and his mother were once again looking for a new place to live. He was working for cash to pay for his medications. (Tr. 622-23). Over the next few contacts, he presented with anxious, depressed and/or irritable mood, shifting affect, obsessive, paranoid, or grandiose thought content, off-topic thought process, or pressured speech.

12

(Tr. 634, 565-66, 567-68, 648). He continued to be depressed by his health and pain in his legs and knees. (Tr. 565-66). He reported that he was having auditory and visual hallucinations. (Tr. 634). On June 2, 2016, Dr. Kohler increased the dosages of his Trazadone, Sertraline, and prazosin. (Tr. 648). On June 21, 2016, his auditory hallucinations and nightmares had returned with poor sleep. (Tr. 636). In early August 2016, Ms. Cox noted that plaintiff had a lot of anger issues. (Tr. 571-72). Later in the month, plaintiff asked Dr. Kohler to prescribe "the nightmare" medication again. (Tr. 573-74). He had constant pain in his legs and knees, which his primary care provider stated could not be treated.

An annual assessment in September 2016 noted that plaintiff continued to report depression, anxiety, anger, agitation, and visual hallucinations. (Tr. 555-57). He told Dr. Kohler that he was isolating himself and having nightmares and crying episodes. (Tr. 640-41). He continued to express anger about how he was treated by family members. Ms. Cox addressed lack of self-control and cognitive distortions. (Tr. 585-86). In early October, he reported that he could not afford the $20 copay for his medications and had tremors and leg pains. His sleep medication was not working. It was noted that he was dirty and had depressed mood, poor concentration and poor attention. He was compliant with his medications. (Tr. 642). Later in October, Ms. Cox and CSP worker Mallorie Hoyer attempted to engage plaintiff in brainstorming to identify ways to increase his socialization and work opportunities. (Tr. 577-78). Although he was hesitant, he agreed to accompany Ms. Hoyer to an animal shelter to consider volunteering. He refused, however, to go to the Clubhouse.[12] It was noted that he presented with grandiose thought content and cognitive distortions.

---

[12] Bootheel's Clubhouse provides training in interpersonal skills and independent living skills, vocationally-oriented day treatment, and recreational programs to individuals with chronic psychiatric disabilities. See https://www.bootheelcounseling.com/services (last visited June 17, 2019).

In early November 2016, plaintiff reported that he "[saw] things such as 'a big dark room'" and thought "his mother [was] calling him when she [was]n't." (Tr. 643-44). He felt paranoid and thought he was being followed. His appetite was poor and his energy was low. He was compliant with his medications. A week later, Ms. Cox noted that plaintiff was unkempt and presented with an anxious, irritable mood with shifting affect and obsessive thought content. (Tr. 583-84). Ms. Hoyer had accompanied him to the animal shelter, where he had a "great" experience volunteering. He had been diagnosed with neuropathy in his leg and was being treated by a specialist. In mid-November, Dr. Kohler noted that plaintiff's sleep medication was not working and that he was very nervous around other people. (Tr. 645). He had auditory and visual hallucinations and was unkempt. His mood and affect were depressed. He was wearing an ankle brace. In late-November, Ms. Cox noted that plaintiff was 30 minutes late for his appointment. (Tr. 587). He reported that he was having a hard time getting around because he was wearing a foot brace. In late-November, Dr. Kohler noted that plaintiff was unkempt. She continued his medications. (Tr. 646-47).

In early 2017, plaintiff reported a number of relationship issues. He had angry outbursts with his nephews when they were disrespectful to his mother and his long-time girlfriend said she didn't want to see him anymore or let him see his children. (Tr. 606-07, 626-27). He was hearing two voices but he could not understand what they were saying. Although he denied having hallucinations, he saw things in the dark and heard things at night. Dr. Kohler added Wellbutrin and stopped fluoxetine. In mid-February, he reported that he would "get to see his sons and sweetheart." (Tr. 628-29). He continued to have auditory and visual hallucinations.

3.    Opinion evidence

On August 28, 2015, Christina Graham, M.A., of Bootheel Counseling, completed a "Daily Living Activities (©DLA-20) Adult Mental Health" scale, which rates an individual's functioning on 20 activities, using a 7-point scale, with 1 representing an extremely severe impairment and 7 indicating an independently managed daily living activity in the community. (Tr. 494). Plaintiff's "average DLA" was 4, indicative of a moderate impairment requiring low level of paid supports. Plaintiff's DLA "score" was 39, qualifying him to receive community psychiatric rehabilitation services.[13] The ALJ gave this "significant" great weight as supported by the objective medical evidence. The ALJ also stated, however, that it was inconsistent with plaintiff's reported activities of daily living. (Tr. 24). A repeat administration of the scale in June 2016 resulted in a slightly lower score, with a one or two-point deterioration in scores related to conforming to community norms, cleanliness, and grooming. (Tr. 495). The ALJ did not address the 2016 assessment.

On December 3, 2015, State agency consultant James W. Morgan, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 80-81, 86-87). Dr. Morgan concluded that plaintiff had medically determinable impairments in the categories of 12.02 (organic mental disorders) and 12.03 (schizophrenic, paranoid, and other psychotic disorders). Dr. Morgan found, however, that there was insufficient evidence in the record to assess plaintiff's mental limitations for the purposes of paragraphs B and C of the listings, noting that plaintiff had failed to return the Function Report that was mailed to him. The ALJ assigned

---

[13] As of April 2014, the Missouri Division of Behavioral Health set a score of 40 or lower for adults over the age of 26 to qualify for CPR services. See Using the DLA-20© to Establish Eligibility for Community Psychiatric Rehabilitation Programs at ¶ 3.6.3.
https://dmh.mo.gov/ada/docs/dla20eligibilityforcprclinicalbulletin28.pdf (last visited June 17, 2019).

Dr. Morgan's opinion little weight because the evidence established that plaintiff had moderate limitations. (Tr. 22-23).

On April 22, 2016, Dr. Kohler wrote a statement that, "[d]ue to his disability," plaintiff was "unable to work or understand training at this time. We will re-evaluate his functioning in a year." (Tr. 403). The ALJ gave little weight to this opinion, noting that the issue of disability is reserved for the Commissioner and the opinion did not include any specific function-by-function work restrictions. (Tr. 23).

In December 2016, Dr. Kohler completed a 6-page "Mental Impairment Questionnaire." (Tr. 405-10). She listed plaintiff's diagnoses as schizoaffective disorder and borderline intellectual functioning. His current GAF was 45 and his highest GAF in the past year was 50. He was being treated with aripiprazole, benztropine, Cymbalta, fluoxetine, prazosin, and zolpidem. She described his treatment as "mostly ineffective" and stated that the medications had the side effects of fatigue and restlessness. When asked to list the clinical findings that demonstrate the severity of plaintiff's mental impairment and symptoms, Dr. Kohler wrote, "facies is depressed, easily angered, difficulty understanding words, judgment is poor, insight nil, poor concentration; abstraction is concrete only." His prognosis was poor. Dr. Kohler also endorsed 16 symptoms, including anhedonia; decreased energy; thoughts of suicide; blunt, flat, or inappropriate affect; impaired impulse control; poverty of speech content; generalized persistent anxiety; somatization unexplained by organic disturbance; mood disorder; difficulty thinking or concentrating; psychomotor disturbance; persistent disturbance of mood or affect; seclusiveness or autistic thinking; emotional isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; easy distractibility; and sleep disturbance. In an assessment of plaintiff's work-related mental abilities and aptitudes, Dr. Kohler stated that

plaintiff was seriously limited, but not precluded, in his abilities to understand, remember, and carry out very short and simple instructions, and ask simple questions or request assistance. She rated him as unable to meet competitive standards or with no useful ability to function in the remaining 21 categories, including getting along with the public and co-workers, dealing with stress, adhering to basic standards of neatness and cleanliness, and completing a normal work schedule without interruptions from psychologically based symptoms. As relevant to the paragraph B criteria for the mental health listings (See below), Dr. Kohler rated plaintiff as having marked limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. She noted that he had chronic low-grade functioning. And, for the purposes of the paragraph C requirements, plaintiff had a "[m]edically documented history of chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration" that "caused more than a minimal limitation of the ability to do any basic work activity" plus a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." As a result of his impairments or treatment, plaintiff was expected to miss more than four days of work per month. He was not a malingerer. Dr. Kohler identified plaintiff's chronic leg pain as an additional factor that would restrict his ability to work on a sustained basis. The ALJ gave this opinion little weight, finding that it was inconsistent with treatment notes and plaintiff's daily activities. (Tr. 23-24).

As noted above, plaintiff's caseworker Becky Murrah testified that plaintiff would be unable to work without supervision. The ALJ gave Ms. Murrah's opinion little weight as inconsistent with the medical evidence and plaintiff's daily activities. (Tr. 24).

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act.  See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the

physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of

Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff met the insured status requirements through December 31, 2016, and had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date. (Tr. 17). At steps two and three, the ALJ found that plaintiff had severe impairments of schizoaffective disorder and borderline intellectual functioning. Plaintiff had nonsevere impairments of hypertension, neuropathy, left knee impairment, and mild degenerative disc disease of the lumbar spine. The ALJ also noted that plaintiff was obese. (Tr. 18). The ALJ then determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[14] (Tr. 18-19).

The ALJ next determined that plaintiff had the RFC to perform a full range of work at all exertional levels, but was limited to performing simple, routine, repetitive tasks with occasional

---

[14] For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had moderate limitations in his abilities to understand, remember and apply information; to interact with others; to concentrate, persist, and maintain pace; and to adapt or manage himself. (Tr. 18-19). He did not satisfy the paragraph C criteria.

interaction with coworkers and no interaction with the general public. He retained the ability to adapt to changes in the workplace on a basic level and accept supervision on a basic level. (Tr. 20). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 21).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work as a sandwich maker, dishwasher, farmhand, and garbage collector. (Tr. 26). His age on the alleged onset date placed him in the "younger individual" category. He had a limited education and was able to communicate in English. Id. The transferability of job skills was not material because plaintiff's past relevant work was unskilled. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a tumbler operator, shuttle spotter, and casting machine tender. (Tr. 26-27). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from January 1, 2007, the alleged onset date, through October 19, 2017, the date of the decision. (Tr. 27).

## V. Discussion

Plaintiff argues that the ALJ erred by failing to give Dr. Kohler's opinion great weight. He also contends that the ALJ did not properly consider listings 12.03 and 12.05. Finally, he contends that the ALJ's finding that he could perform work as a tumbler operator, shuttle spotter,

and casting machine tender was inconsistent with the finding that plaintiff could not perform his past relevant work.

## A.    Treating Physician's Opinion

Plaintiff argues that the ALJ should have given great weight to the opinion of his treating psychiatrist, Dr. Kohler.  "A treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[15]  Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016) (internal quotation and citations omitted).  A treating physician's opinion, however, "does not automatically control or obviate the need to evaluate the record as a whole."  Id. at 1122-23 (citation omitted).  Rather, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id. (citation omitted).  An ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that ALJ does not find credible.  Vance v. Berryhill, 860 F.3d 1114, 1120 (8th Cir. 2017) (citation omitted).

Dr. Kohler's December 2016 assessment is set out above.  As most relevant to the issues here, she opined that, as the result of schizoaffective disorder and borderline intellectual functioning, plaintiff was unable to meet competitive standards or had no useful ability to function in 21 categories of work-related mental abilities and aptitudes, including getting along

---

[15]This continues to be true for plaintiff's claim because it was filed before March 27, 2017.  Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

with the public and co-workers, dealing with stress, adhering to basic standards of neatness and cleanliness, and completing a normal work schedule without interruptions from psychologically based symptoms. According to Dr. Kohler, plaintiff had marked limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. In addition, as a result of his mental impairment, "even a minimal increase in mental demands or change in the environment would be predicted to cause [him] to decompensate." Finally, plaintiff was expected to miss more than four days of work per month.

The ALJ rejected Dr. Kohler's opinion as unsupported by "the objective medical evidence." (Tr. 23). The ALJ explained that:

> [T]reatment notes indicated that the claimant's thoughts were sometimes noted as coherent or goal directed, but at other times, they were noted as paranoid, obsessive, confused or off topic. It was also noted that claimant hallucinated, but denied suicidal or homicidal ideations. Treatment notes also indicated that the claimant's speech was variously described as loud, pressured, hesitant, appropriate or normal. Further, treatment notes indicated that at times, the claimant was fidgety and restless; however, on other occasions, his psychomotor activity was noted as unremarkable and his motor activity was noted as appropriate. The notes also generally indicated that the claimant maintained fair or good eye content. Moreover, the notes stated that the claimant's judgment was fair, but his insight, attention, and concentration fluctuated between poor and fair. It was also consistently noted that the claimant was oriented to person, place, and time and that his immediate, recent, and remote memory were intact. In addition this opinion is inconsistent with the claimant's reported activities of daily living as he testified that *he drives, mows the lawn, helps with the dishes, fixes himself simple meals, and watched YouTube videos on his phone. Finally, treatment notes also indicated that the claimant's grooming was appropriate.*

(Tr. 23-24) (emphasis in original; citations omitted).

As an initial matter, the Court notes that there are some material errors or omissions in the ALJ's recitation of the mental status findings. First, plaintiff frequently displayed poor judgment. (Tr. 399-400, 397, 610-11, 630-31, 639, 642, 577-78, 643-44, 645, 646-47, 626-27, 628, 612-13). In addition, he frequently had poor or unkempt grooming. (Tr. 630-31, 637-38,

642, 645, 646-47). And, he was not fully oriented on at least one occasion (Tr. 399-400). In addition, he was noted to have poor impulse control (Tr. 544), could be very demanding (Tr. 523 — noting that plaintiff called Bootheel up to 21 times a day), and had occasional thoughts and nightmares of hurting or killing people (Tr. 543, 530, 636, 391, 654). More significantly, the ALJ did not explain how Dr. Kohler's opinion is inconsistent with findings of hallucinations, paranoid or obsessive thoughts, and poor insight, attention, and concentration. Findings of good eye contact and intact memory are not enough to outweigh the serious and disruptive symptoms documented here. Dr. Kohler's opinion is also consistent with reports that plaintiff isolated himself and had significant conflict with family members.

Dr. Kohler opined that plaintiff was likely to decompensate under the stress of working. The treatment records bear this out. Even after two years of extensive, multimodal treatment and support, plaintiff continued to experience isolation, conflict with family members, depressed mood, hallucinations, and he had to be accompanied by a case manager in order to volunteer at an animal shelter. The ALJ's reliance on plaintiff's ability to drive, mow the lawn, help with the dishes, fix himself simple meals, and watch YouTube videos on his phone is unavailing because they do not address Dr. Kohler's assertion that he was not able to withstand an increase in mental demands or a change in the environment. Defendant argues that Dr. Kohler's opinion is undermined by her own statement in the December 2016 assessment that he functioned at a 10th grade level. [Doc. # 27 at p.8, citing Tr. 408]. The Court has not been able to locate such a statement by Dr. Kohler in her 2016 assessment or elsewhere in the treatment notes.

The Court finds that the ALJ's decision to give little weight to the opinion of plaintiff's treating psychiatrist is not supported by substantial evidence in the record.

## B.       Listings 12.03 and 12.05B

Plaintiff argues that the ALJ erred in failing to determine whether he meets the requirements for listings 12.03 (schizophrenia spectrum and other psychotic disorders) and 12.05B (intellectual disorders).

In order to meet the requirements for listing 12.03, plaintiff must demonstrate the existence of the paragraph A criteria and meet either the paragraph B or the paragraph C criteria. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (Listing 12.03). Paragraph A is satisfied by showing medical documentation of (1) delusions or hallucinations, (2) disorganized thinking (speech), or grossly disorganized behavior or catatonia. Defendant concedes that plaintiff satisfies the requirements of 12.03A. [Doc. # 27 at 6-7]. The paragraph B criteria are satisfied by showing either "extreme limitation of one" or "marked limitation of two" of the following areas of mental functioning: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. Dr. Kohler found that plaintiff had marked limitations in all four areas, while the ALJ found that plaintiff was only moderately limited.[16] (Tr. 408, 18-19). Because this matter will be remanded to reconsider the weight to be given to Dr. Kohler's opinion, the paragraph B criteria can be reconsidered at that time. The paragraph C criteria are satisfied by showing a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder, and (2) marginal adjustment, as demonstrated by minimal capacity to adapt to

---

[16] For the purposes of the mental disorder listings, a claimant has a "marked" limitation when his or her "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1,listing 12.00F.2.d.

changes in the environment or to demands that are not already part of the claimant's daily life. Dr. Kohler's report arguably supports a finding that plaintiff satisfies the paragraph C criteria. Again, this is an issue that can be addressed on remand.

As relevant to the argument here, plaintiff can satisfy listing 12.05B by showing (1) significantly subaverage general intellectual functioning evidenced by a full scale IQ score of 70 or below, and (2) significant deficits in adaptive functioning as shown by extreme limitation of one, or marked limitation of two, of the four areas of mental functioning listed above, and (3) evidence that the disorder began before he turned 22. <u>See</u> 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (Listing 12.05).

Social security regulations require that IQ test results be sufficiently current to be considered "valid." See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10). IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above. <u>Id.</u> And, IQ test results obtained between the ages of 7 and 16 are considered current for 4 years when the tested IQ is less than 40 and for 2 years when the IQ is 40 or above. <u>Id.</u> The IQ scores on which plaintiff relies were obtained when he was in kindergarten and when he was age 10. (Tr. 723, 728-29). These test results cannot be considered a valid assessment of plaintiff's current IQ and thus cannot be relied on to establish the requirements of listing 12.05B.

### C. Alleged Inconsistency

At the hearing, the vocational expert Janice Hastert testified that an individual with plaintiff's educational background and work history, who had no exertional limitations, but was limited to simple, routine, repetitive tasks with occasional interaction with coworkers and no interaction with the general public was capable of performing both plaintiff's past relevant work, which Ms. Hastert identified as a sandwich maker, dishwasher, farm hand, and garbage collector,

<u>and</u> work as a tumbler operator, shuttle spotter, and casting machine tender. (Tr. 56-57). As plaintiff notes, both sets of jobs have a specific vocational preparation (SVP) score of 2 and are performed at the medium level of exertion. Nonetheless, the ALJ found that plaintiff could not perform his past work but could perform the other work Ms. Hastert identified. Plaintiff argues that this is a logical inconsistency. The Court agrees that the ALJ did not state what distinguished the two sets of jobs, but notes that, at the hearing, the ALJ expressed concern that plaintiff's past work was performed sporadically and asked Ms. Hastert to discuss other work available in the national economy. (Tr. 57). Because this matter is being remanded for further consideration of Dr. Kohler's opinion, which may affect the RFC determination, the Court concludes that it is not necessary to resolve the apparent inconsistency.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of June, 2019.